# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Case No.:

JME INVESTMENTS, LLC, a Colorado Limited Liability Company, and HIWAY BAR, LLC, a Colorado Limited Liability Company,

Plaintiffs,

v.

WESTFIELD INSURANCE COMPANY, an Ohio Corporation

Defendant.

## COMPLAINT AND JURY DEMAND

Plaintiffs, JME Investments, LLC and Hiway Bar, LLC, Colorado corporations, by and through their undersigned counsel, herewith state and aver the following as their Complaint and Jury Demand against Defendant, Westfield Insurance Company, an Ohio corporation:

### I.   Parties

1. Plaintiff JME Investments, LLC ("JME"), is a Colorado limited liability company with its principal place of business located in Jefferson County, Colorado.

2. Plaintiff, Hiway Bar, LLC ("Hiway Bar"), is a Colorado limited liability company, doing business as the HiWay 40 Grill & Lodge, and has its principal place of business in Routt County, Colorado.

3. Defendant, Westfield Insurance Company ("Westfield"), is an Ohio corporation that is authorized to transact insurance business in Colorado.

## II. Jurisdiction and Venue

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (a)(1) and (d)(2) in that this action is between citizens of different states and seeks monetary relief in excess of $75,000, exclusive of interest, costs, and attorneys' fees.

5. This Court has personal jurisdiction over Westfield because it is authorized to sell and does sell insurance in the State of Colorado.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in the District of Colorado and caused harm to Plaintiffs, both of which are Colorado limited liability companies.

## III. General Allegations

7. JME and the Hiway Bar incorporate herein, as if fully set forth, all allegations set forth elsewhere in this Complaint.

8. JME is the owner of the building located at 136 East Jefferson Avenue in Hayden, Colorado ("the Building").

9. In July of 2020, JME leased the entire Building to the Hiway Bar, and the Hiway Bar operated the restaurant and bar on the ground floor and leased three residential apartments on the second floor to various tenants.

10. In July of 2020, the Hiway Bar operated a grill and bar establishment in the Building.

11. Portions of the Building were originally constructed in the 1890's and other portions were constructed in the 1930's.

12. On July 12, 2020, a fire occurred in the Building, which took nearly two hours for the fire department to put out ("the Fire").

13. The Fire started in a portion of the Building leased to the Hiway Bar, but spread to other parts of the Building.

14. As a result of the Fire, portions of the Building and property owned and/or used by JME and the Hiway Bar were damaged by fire, smoke, soot and heat.

15. At the time of the Fire, JME insured the Building, its business personal property, and rental value with Westfield under Policy No. CWP 3170594 ("the JME Policy").

16. The JME Policy insured the Building, as well as JME's business personal property, lost rents, and provided various other coverages to JME, including without limitation, debris removal additional insurance, computer coverage, extra expense coverage, ordinance & law

coverage, pollutant cleanup & removal, food spoilage, valuable papers & records, and coverage for business income loss from dependent properties.

17. At the time of the Fire, the Hiway Bar insured its business personal property and its tenants improvements and betterments with Westfield under Policy No. CWP 7477023 (the "Hiway Bar Policy").

18. The Hiway Bar Policy insured the Hiway Bar's business personal property and its improvements and betterments, and provided various other coverages to the Hiway Bar, including without limitation, debris removal additional insurance, computer coverage, extra expense overage, ordinance & law coverage, pollutant cleanup & removal, food spoilage, valuable papers & records, and coverage for business income loss from dependent properties.

19. After the Fire, JME and Hiway Bar promptly reported their respective claims to Westfield.

20. Westfield hired Crawford & Company to inspect and adjust JME's and Hiway Bar's losses caused by the Fire.

21. Crawford & Company assigned Lucinda Miller to travel to the site of the Fire, inspect the loss, determine the scope of the damage caused by the Fire, and develop estimates of the cost to repair the damage caused by the Fire to both JME and Hiway Bar.

22. After Ms. Miller's inspection on July 15, 2020, she prepared an estimate of the replacement cost to repair the damages to the Building caused by the Fire in the amount of $56,394.72, and of the actual cash value in the amount of $29,149.79.

23. When the Westfield adjuster assigned to the claims, Meghan Schmidt, advised Matthew Elam, one of the principals of JME and the principal of Hiway Bar, of these initial figures, she apologized that the figures were so low, and she called them "insulting".

24. In response to Westfield's "insulting" determination of the scope of the damages caused by the Fire and the repair cost of those damages, JME and Hiway Bar were compelled to hire Adjusters International, a public adjusting company, to provide guidance and assistance in pursuing their insurance claims against Westfield.

25. Westfield then hired Grecco Construction Consultants, who assigned Michael McCormack, to take over for Crawford and Ms. Miller and serve as Westfield's building consultant to inspect the loss, determine the scope of the damage caused by the Fire, and develop estimates of the cost to repair the damage caused by the Fire to both JME and Hiway Bar.

26. Mr. McCormack conducted his first inspection of the Building on August 12, 2020, while JME's retained Professional Engineer, Derek Pumphrey of New Rome Enterprises, Eric Conner of ServiceMaster, and the public adjusters hired by JME and Hiway Bar (Michael Stoycheff and Scott deLuise) were all present.

27. During the August 12, 2020 inspection, the public adjusters noted that the extent of the damage from the Fire was expected to be significant enough that even the actual cash value of the loss was going to exceed the $625,000 building limit of the JME Policy; and Mr. McCormack commented that the loss was much larger than what Ms. Miller had initially determined, and that he expected the repair cost to be at least close to the building limit of the JME Policy.

28. Mr. McCormack's September 16, 2020, estimate was for $170,610.31, on a replacement cost basis, which was more than triple the amount of Westfield's original estimate (prepared by Crawford), but was less than 28% of the $625,000 building limit he informed JME representatives on August 12, 2020 that he expected his estimate to be. This estimate included 10% for overhead and 10% for profit, but used Denver-based rather than resort-based pricing, in spite of Hayden being less than 30 miles from Steamboat Springs, a well-known Colorado resort area, and over 180 miles from Denver, Colorado.

29. At the request of JME's public adjusters, Mr. McCormack attended a re-inspection of the Building on November 4, 2020, along with Mr. Stoycheff (one of JME's public adjusters), Derek Pumphrey (JME's professional engineer), and Eric Connor (with ServiceMaster).

30. In his December 4, 2020 report, Mr. Pumphrey noted the scope of damage to the Building from the Fire included smoke damage between the second floor ceiling and roof membrane between the skip decking and roof, and provided repair plans with his professional engineering stamp.

31. On December 10, 2020, on behalf of JME, Mr. Stoycheff sent to Westfield and Mr. McCormack the December 4, 2020 professional engineer's report and accompanying stamped repair drawings by Mr. Pumphrey; Mr. Stoycheff's demolition and mitigation cost estimates; photographs showing the second floor ceiling demolition and the ceiling cavity with no insulation and skip sheathing as the roof deck, the roof trusses running east to west with skip sheathing above and no plywood decking above it (facilitating the spread of smoke during the Fire, and showing that the ISO Board above the skip decking had been damaged and needed to be removed to due

6

smoke infiltration and odor; and an email from Mr. Connor of ServiceMaster stating his professional opinion that the demolition and additional smoke remediation work still needed to be completed to all areas of the Building in order to properly remediate the damage from the Fire.

32.     In his December 10, 2020 cover letter to Ms. Schmidt at Westfield and Mr. McCormack, Mr. Stoycheff pointed out that the information he provided with his letter proved the scope of the demolition, mitigation and repairs to the Building necessitated by the Fire that had already been completed and remained to be completed, and that he would now proceed to prepare a repair cost estimate which he expected would exceed the $625,000 policy limit, and also to exhaust some, if not all, of the policy extensions. Mr. Stoycheff further noted that the remaining demolition and mitigation were expected to be completed by the end of January of 2021, a six to eight month period of restoration was anticipated at that point, and he invited Westfield to contact him to participate in a conference so Westfield could more efficiently resolve any remaining questions Westfield had.

33.     After acknowledging receipt of the materials sent by Mr. Stoycheff on December 10, 2020, Ms. Schmidt advised Mr. Stoycheff on December 30, 2020 that she expected to have Mr. McCormack's revised estimate by the following week, which she anticipated providing to Mr. Stoycheff shortly thereafter. Westfield and Ms. Schmidt did not provide Mr. McCormack's revised estimate to JME's representative until four months later, on April 6, 2021.

34.     Having still not received Mr. McCormack's promised updated estimate, on January 19, 2021, Mr. Stoycheff emailed Westfield asking for an update and noting that JME was continuing to proceed with proper mitigation of the Building of the damages caused by the Fire,

7

which was expected to be finished by the end of January of 2021, at which point JME then intended to move forward with the needed repairs.

35. On February 2, 2021, Mr. Stoycheff again emailed Ms. Schmidt asking for an update from Westfield since he had still not yet seen any revised estimate from Westfield's appointed building consultant, Mr. McCormack, at which time he also noted that JME had completed the demolition of the Fire damage to the Building, and expected to be done with the mitigation work soon.

36. Three months after his last site visit, and nearly two months after receiving the New Rome report, photographs and Mr. Stoycheff's demolition and repair cost estimates, and after ServiceMaster had completed the remediation and repair work that Westfield was repeatedly informed was progressing throughout January of 2021, Mr. McCormack (as Westfield's representative) advised Mr. Stoycheff (as JME's representative) on February 3, 2021 that Westfield now desired to have its own hired professional engineer inspect and evaluate the Building

37. On February 5, 2021, Mr. Stoycheff submitted to Westfield the business personal property claims for both JME and the Hiway Bar, along with additional photographs of the demolition, cleaning and mitigation of the Building.

38. On or about February 22, 2021, Westfield paid the policy limits for the business personal property claims of JME and the Hiway Bar.

39. Westfield's requested additional re-inspection took place on February 22, 2021, which was attended by Mr. Stoycheff, Mr. McCormack, Mr. Pumphrey, Mr. Connor and Westfield's newly retained professional engineer, Brent Cornelison of BC Engineering in Idaho.

40. At the February 22, 2021 site visit, Mr. Cornelison spent less than one hour inspecting and then stated the Building should just be torn down; and, Mr. McCormack was highly critical of the extent of the demolition and remediation work that had taken place since his November 4, 2020 inspection, in spite of the fact he was repeatedly advised in December of 2020 and January 2021 that JME was proceeding with demolition and remediation work throughout that time, and knowing JME and the Hiway Bar were businesses that were losing lots of income due to the fully shut-down condition of the bar and apartments and could not afford to simply wait for months for Westfield to later inform them they wanted to conduct another inspection.

41. After receiving Mr. Cornelison's report dated March 24, 2021, whose brief inspection did not take place until much of the fire, soot and smoke damage had been demolished and remediated, on April 6, 2021 Westfield (Ms. Schmidt) provided to JME Mr. McCormack's long-promised updated estimate, which totaled $196,466.95 for replacement cost and $171,354.27 for actual cash value, and issued a payment of $21,185.16 as the balance of the unpaid actual cash value. Mr. McCormack's estimate still failed to include the need to address the smoke that impregnated the interstitial space between the original exterior walls and the balloon framed walls, and failed to address the smoke and soot in the ceiling spaces – all of which conditions were readily apparent by the November 4, 2020 inspection at the latest. Mr. McCormack's estimate was still

less than one-third of the $625,000 JME Policy limit for the Building that he initially stated he expected the repair cost to be close to.

42. On April 19, 2021, Mr. Stoycheff sent to Westfield ServiceMaster's estimate of the cost for the emergency clean-up, deodorization, mitigation and debris removal, most of which had been completed, in the amount of $297,030.44; and an estimate of the repair cost from JME's chosen general contractor, HLCC Construction Company, showing that the replacement cost to repair the damage to the Building from the Fire was $1,196,221, well in excess of the JME Policy limit for the Building.

43. On May 24, 2021, Westfield responded to the April 19, 2021 submission by falsely accusing JME of proceeding with demolition and building alteration without Westfield's knowledge, and threatening JME by citing the duty to cooperate and inspection loss conditions in the JME Policy. Westfield and its hired representative, Mr. McCormack, knew since December of 2020 that JME had been proceeding forward with the demolition and debris removal of the Fire damage that was necessary to fully remediate all of the damage from the Fire so JME and the Hiway Bar could rebuild and resume their businesses.

44. Without having conducted any further site inspections, on June 2, 2021, Westfield issued another actual cash value payment to JME for the damage to the Building in the amount of $72,144.24, again using Denver-area pricing, based on its determination that the replacement cost for the Fire caused damages to the Building was $273,115.32, and an actual cash value of $243,498.51.

45.     JME responded to Westfield's June 2, 2021 letter and payment by again requesting that Westfield reasonably and properly adjust the loss and pay the $625,000 Building limit, plus additional benefits owed under the JME Policy, and pay additional benefits owed under the Hiway Bar Policy.

46.     By letter dated September 24, 2021, Westfield responded by demanding that the JME Building damage be determined through the appraisal process provided for in the JME Policy, and, by this letter and letters dated September 28 and October 1, 2021 asking for additional documentation for the other claims.

47.     The appraisal of the Building damage dispute demanded by Westfield resulted in an Appraisal Award dated January 31, 2022 agreed to by both Westfield's appointed appraiser and JME's appointed appraiser, in the amount of $875,000 on a replacement cost basis, and $612,500 on an actual cash value basis. Westfield then paid the differences between the actual cash value of the Building damage determined by the appraisers ($612,500) and the sum it has previously paid ($238,498.51) less JME's deductible ($5,000), for a payment of $369,001.49.

48.     The amount of the Appraisal Award shows that Westfield's estimates were grossly deficient since the beginning. The Crawford & Company estimate of $56,394 was only 6.4% of the Award; the initial McCormack estimate was only 20.7% of the Award; the second McCormack estimate was only 24.2% of the Award; and the third McCormack estimate was still only 33% of the Award.

49. In addition to the $625,000 limit for the Building, the JME Policy includes an additional $100,000 of coverage for debris removal, plus another $100,000 of coverage for law & ordinance, $50,000 for extra expense and $5,000 for fire suppression recharge, totaling $880,000 in available coverage for the repair of the Fire damage to the Building. After payment of the actual cash value determined by the appraisers, that leaves another $12,500 as available and owed for the Building coverage ,plus the $255,000 for debris removal , law & ordinance, extra expense and fire suppression recharge, for a total available and/or owed on the JME claim of $267,500.

50. Pursuant to the documentation the Hiway Bar has provided to Westfield, another $22,364 is still available and owed for tenant's improvements and betterment, $50,000 is available and owed for extra expense; and $100,000 is still available and owed for law & ordinance, for a total available and owed on the Hiway Bar claim of $172,364.

51. Westfield's delays and denials of payment of covered benefits owed in the JME Policy and Hiway Bar Policy for damages and losses resulting from the Fire are improper and without a reasonable basis, including because:

   a. The damages and losses to JME and the Hiway Bar caused by and/or resulting from the Fire and claimed by JME and the Hiway Bar are covered under the JME Policy and Hiway Bar Policy;

   b. There are no applicable exclusions to JME's and the Hiway Bar's claims, under either Policy;

12

    c. Within a short time after the Fire, it was evident that the cost to complete the remediation, demolition and repair of the Fire damage at the JME Building would exceed the Policy limits applicable to those coverages and should have been paid;

    d. There are other benefits owed under the JME Policy that have remained unpaid but are owed, and other benefits that Westfield has paid but in an untimely manner.

    e. There are benefits owed under the Hiway Bar Policy that have remained unpaid but are owed, and other benefits that Westfield has paid but in an untimely manner;

52. JME and the Hiway Bar have been forced to hire Public Adjusters and then legal counsel to assist them in obtaining the benefits owed under the JME Policy and the Hiway Bar Policy.

## IV.  First Claim for Relief

(Breach of Contract)

53. JME and the Hiway Bar incorporate herein, as if fully set forth, all allegations set forth elsewhere in this Complaint.

54. The JME and Hiway Bar Policies are contracts under which Westfield agreed to pay, on a replacement cost basis, for, among other things, direct physical loss of or damage to the JME Building, the Business Personal Property of JME and the Hiway Bar, the Hiway Bar's improvements and betterments, debris removal, law & ordinance, and Loss of Income and Extra Expense, as well as for other losses caused by fire at the JME Building.

13

55. The JME Building, the Business Personal Property of JME and the Hiway Bar and the Hiway Bar's improvements and betterments all suffered direct physical loss or damage as a result of the Fire, each suffered losses of business income as a result of the Fire, and each suffered other losses and damages as a result of the Fire, which are damages and loss covered by the JME Policy and the Hiway Bar Policy.

56. Westfield has breached both the JME Policy and the Hiway Bar Policy by failing to pay and/or failing to pay the full amount owed to JME and the Hiway Bar for the damages and losses resulting from the Fire.

## V.    Second Claim for Relief

(Statutory Delay/Denial; Violation of C.R.S. §§ 10-3-1115 & 1116)

57. JME and the Hiway Bar incorporate herein, as if fully set forth, all allegations set forth elsewhere in this Complaint.

58. JME and the Hiway Bar are each "first-party claimants", as defined in C.R.S. § 10-3-1115.

59. Under the JME Policy and the Hiway Bar Policy, Westfield owed and still owes benefits to JME and the Hiway Bar for the repair, actual cash value, and replacement costs of the damage to the Building, Business Personal Property, Loss of Income and other damages and losses resulting from the Fire, as more fully described above.

60. Westfield has unreasonably delayed payment of and has unreasonably failed to pay all of the benefits owed to JME and the Hiway Bar without a reasonable basis.

61. Westfield's failure to timely pay and failure to pay at all to JME and the Hiway Bar the benefits owed under the JME Policy and the Hiway Bar Policy violates C.R.S. § 10-3-1115, thereby entitling JME and the Hiway Bar to the remedies included in C.R.S. §10-3-1116, including two times the covered benefits, costs and attorney's fees.

## VI. Third Claim for Relief

(Common Law Bad Faith)

62. JME and the Hiway Bar incorporate herein, as if fully set forth, all allegations set forth elsewhere in this Complaint.

63. Westfield owed and continues to owe its policyholders, JME and the Hiway Bar, the duty of good faith and fair dealing when investigating, evaluating and paying for the losses suffered as a result of the Fire.

64. Westfield breached and continues to breach this duty by, among other things, engaging in one of more of the following acts, some of which are considered Unfair Claim Settlement Practices pursuant to C.R.S. §10-3-1104(1)(h):

    a. unreasonably failing to timely pay JME's and the Hiway Bar's claims;

    b. unreasonably failing to properly construe the Policies;

    c. unreasonably failing to make payments in a reasonable and timely manner;

   d. misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue [C.R.S. §10-3-1104(1)(h)(I)];

   e. failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under the Policies [C.R.S. §10-3-1104(1)(h)(II)];

   f. failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies [C.R.S. §10-3-1104(1)(h)(III)];

   g. refusing to pay claims without conducting a reasonable investigation based upon all available information [C.R.S. §10-3-1104(1)(h)(IV)];

   h. not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear [C.R.S. §10-3-1104(1)(h)(VI)];

   i. compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds [C.R.S. §10-3-1104(1)(h)(VII)];

   j. failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement [C.R.S. §10-3-1104(1)(h)(XIV)];

   k. failing to act reasonably in the adjustment and resolution of JME's and the Hiway Bar's claims, when Westfield was aware or should have been aware of its negligence;

   l. failing to comply with reasonable standards in connection with the investigation, resolution, and adjustment of JME's and the Hiway Bar's claims; and

   m. unreasonably denying or failing to affirm coverage for JME's and the Hiway Bar's claims within a reasonable time after investigation.

65. Westfield's breaches of the duty of good faith and fair dealing were unreasonable and was action taken by Westfield either knowing it was unreasonable, or in reckless disregard of the fact its action was unreasonable.

66. Westfield's breach of the duty of good faith and fair dealing has caused JME and the Hiway Bar damages, including loss of funds, delays in making repairs, loss of income, public adjusting fees, legal fees, and other damages.

67. Westfield's actions were willful, wanton and in reckless disregard for the rights and feelings of JME and the Hiway Bar.

**WHEREFORE**, JME and the Hiway Bar pray this Honorable Court to:

1. Enter judgment in favor of JME and the Hiway Bar and against Westfield for their respective losses and damages resulting from Westfield's failure to honor the terms of the Policies and Colorado law; for their public adjusting fees, their attorney's fees; and, for other bad faith damages;

2. Award the remedies provided in C.R.S. § 10-3-1116(1), including the actual damages of two times the amount of the covered benefit, plus attorney's fees and costs;

3. Award prejudgment and post-judgment interest and costs; and

4. Award such other and further relief as this Court deems just and proper.

## JURY DEMAND

**PLAINTIFFS DEMAND A TRIAL BY A JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 26th day of April, 2022.

*(Original signed copy on file at the law offices of Burg Simpson Eldredge Hersh & Jardine, P.C.)*

/s/ Thomas W. Henderson
Thomas W Henderson
Nelson Boyle
**BURG SIMPSON**
**ELDREDGE HERSH & JARDINE, P.C.**
40 Inverness Drive East
Englewood, CO, 80112
Telephone: (303) 792-5595
Facsimile: (303) 708-0527
Email:  thenderson@burgsimpson.com
            nboyle@burgsimpson.com

ATTORNEYS FOR PLAINTIFFS

Plaintiffs' Addresses:
JME Investments, LLC
18975 W. 55th Circle
Golden, CO 80403

Hiway Bar, LLC
136 E. Jefferson Ave.
Hayden, Colorado 81639

18