IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:22-cv-01012-CNS-JPO

JME INVESTMENTS, LLC, a Colorado Limited Liability Company, and HIWAY BAR, LLC, a Colorado Limited Liability Company,

      Plaintiffs,

v.

WESTFIELD INSURANCE COMPANY, an Ohio Corporation,

      Defendant.

---

## ORDER

---

      This order addresses three pending motions before the Court. The first two are competing summary judgment motions. Defendant and Counterclaim Plaintiff Westfield Insurance Company moves for summary judgment on its three counterclaims: breach of contract, declaratory judgment, and recoupment, and for summary judgment on Plaintiffs' three affirmative claims: breach of contract, statutory delay/denial, and common law bad faith. ECF No. 114. Plaintiffs and Counterclaim Defendants JME Investments, LLC and Hiway Bar, LLC move for summary judgment on Westfield's counterclaims. ECF No. 117. As discussed below, the Court concludes that these competing motions are laden with genuine factual disputes, rendering summary judgment inappropriate.

      The third pending motion is Westfield's Motion to Exclude Opinions and Testimony of Damian J. Arguello, Plaintiffs' claims-handling expert. ECF No. 116. After analyzing the

1

parties' positions and Mr. Arguello's expert reports, the Court grants in part and denies in part Westfield's motion to exclude.

## I.    BACKGROUND

This case arises from a July 12, 2020 kitchen fire in Hayden, Colorado. ECF No. 126, ¶ 137. The fire burned a building owned by JME that was constructed in the 1890s. ECF No. 117, ¶¶ 3–4. Beginning in 2018, JME leased the entire building to Hiway Bar for $4,000 per month. *Id.*, ¶ 8. Hiway Bar operated a restaurant and bar on the ground floor and leased the three residential apartments on the second floor to tourists and visitors, particularly to hunters during hunting season. *Id.* Westfield insured the building for $625,500. ECF No. 114, ¶ 5. JME admits that it "woefully" underinsured the building. ECF No. 117 at 24. Still, the parties agree that Westfield has paid Plaintiffs over $900,000 on their claims arising from the fire loss. ECF No. 114, ¶ 134.

### A.  The Parties and the Insurance Policies

JME is a Colorado limited liability company jointly owned by two brothers, John and Matt Elam. *Id.*, ¶ 1. Hiway Bar is also a Colorado limited liability company, but it is owned solely by Matt Elam; John Elam has no interest in this entity. *Id.*, ¶ 2. Westfield issued commercial insurance policies to Plaintiffs for the period December 3, 2019, through December 3, 2020. ECF No. 114, ¶ 4. The JME policy provided commercial property coverage, including building loss coverage, up to $625,500. *Id.*, ¶ 5. The JME policy provides that "[w]e will not pay for any loss or damage in any case of . . . concealment or misrepresentation of a material fact committed by you . . . and relating to coverage under this policy." ECF No. 117, ¶ 11. Separately, Hiway Bar insured its

"business personal property and tenant improvements" with Westfield under a separate Westfield policy. *Id.* ¶ 14.[1]

### B. July 12, 2020 Fire and Westfield's Investigation

The fire that burned JME's building occurred on July 12, 2020. ECF No. 126, ¶ 137. The day after the fire, Westfield assigned Meghan Schmidt as the adjuster on the claim. ECF No. 114, ¶ 9. Schmidt hired Crawford & Company—an independent adjuster— to inspect and adjust the claim on behalf of Westfield. ECF No. 117, ¶ 22. Lucinda Miller of Crawford & Company inspected the building on July 15, 2020. *Id.* Miller reported that the building "did not appear to be a total gut" and that it did not appear that "all walls would need to be removed." ECF No. 114, ¶ 11. Plaintiffs contend that Miller's evaluation was "highly suspect." ECF No. 126, ¶ 11. Plaintiffs does not say why, but the Court assumes that it is because her estimate of $56,000 for replacement cost value (RCV) and $29,000

---

[1] The Court finds it helpful to outline the key players involved in the fire investigation, organized by party:

**Westfield:**
- Meghan Schmidt: Senior Property Claim Representative for Westfield; Westfield assigned Schmidt to adjust the fire loss.
- Lucinda Miller: Adjuster with Crawford & Company, Westfield's local independent adjuster.
- Michael McCormack: Regional Consultant with Grecco Building Consultants; Westfield hired Grecco to further investigate the building loss.

**Plaintiffs:**
- Michael Stoycheff: National General Adjuster with Adjusters International-MBC, LLC (Adjusters International); Plaintiffs retained Adjusters International as their public adjuster.
- Scott deLuise: Chief Executive Officer of Adjusters International.
- Kalon deLuise: Chief Operating Officer of Adjusters International.
- Derek Pumphrey: Engineer with New Rome Engineering; Plaintiffs hired Pumphrey.
- ServiceMaster Cleaning & Restoration: Plaintiffs' remediation contractor.
- HLCC Construction Company: JME's general contractor to rebuild the building.

for actual cash value (ACV) was significantly less than the eventual appraisal award of $875,000 for RCV. *Id.*, ¶¶ 11–12.[2]

On July 28, 2020, Plaintiffs retained Adjusters International-MBC, LLC (Adjusters International) as their public adjuster. ECF No. 114, ¶ 14. On August 3, 2020, Westfield sent Crawford & Company's "initial estimate" to Adjusters International. *Id.*, ¶ 14. Plaintiffs do not dispute that Schmidt characterized the independent adjuster's report as an initial estimate, but they dispute that it was, in fact, the initial, as opposed to final, estimate. ECF No. 126, ¶ 15. The next day, Westfield issued a $24,149.79 payment to Plaintiffs based on Crawford & Company's ACV estimate of the documented loss to date less a $5,000 deductible. ECF No. 114, ¶ 16.

On August 6, 2020, Westfield hired Grecco Building Consultants to further investigate the building loss. *Id.*, ¶ 17. On August 12, 2020, Michael McCormack of Grecco inspected the building with Michael Stoycheff (the Adjusters International adjuster handling the building loss), Derek Pumphrey (Plaintiffs' engineer from New Rome Engineering), and Scott deLuise of Adjusters International. *Id.*, ¶ 19. Stoycheff informed Plaintiffs' remediation contractor, ServiceMaster Cleaning & Restoration, that he wanted to "get on record a demolition scope of work approved by the adjuster" and obtain Westfield's "full buy in on the cleaning scope as well." *Id.*, ¶ 21. The parties agree that Stoycheff understood that Westfield's approval and full buy in for the demolition and cleaning scope were important to ensure that Westfield "would pay for it." *Id.*, ¶ 22.

---

[2] The Court explains the parties' competing positions here merely to highlight the numerous genuine material fact disputes that make summary judgment unwarranted.

Stoycheff told Plaintiffs and deLuise that he and Schmidt "agreed to take a slow approach with ServiceMaster on both the building demo and BPP processing." *Id.*, ¶ 24.

McCormack prepared a "preliminary estimate" of the Building loss using software called Xactimate and sent it to Stoycheff on September 16, 2020. *Id.*, ¶ 30. McCormack estimated the RCV cost of the repairs to be $170,610.31. ECF No. 117, ¶ 32. McCormack stated that he would "close [his] file unless further considerations are requested and approved by" Schmidt. ECF No. 125, ¶ 32. Plaintiffs contend that "McCormack issued a woefully inadequate repair estimate." ECF No. 126, ¶ 30 (no record citation). The parties again dispute whether McCormack's estimate was an initial or final estimate. ECF No. 114, ¶ 31; ECF No. 126, ¶ 31. At Westfield's direction, McCormack sent a revised estimate with depreciation applied on October 5, 2020, which (again) estimated the RCV of the building loss at $170,610.31 with $20,441.20 in recoverable depreciation. ECF No. 114, ¶ 32. The same day, Westfield issued a $121,019.32 ACV payment based on McCormack's estimate. *Id.*, ¶ 33.

The next inspection of the building occurred on November 4, 2020. ECF No. 117, ¶ 34. McCormack, Stoycheff, Pumphrey, and a representative from ServiceMaster attended. *Id.* Following the inspection, McCormack and Stoycheff did not reach a full agreement on the extent of smoke damage or the scope and price of repairs. ECF No. 114, ¶ 34. McCormack reported potential areas of disagreement to Westfield and informed Westfield that he would await receipt of Pumphrey's engineer's report and ServiceMaster's "demo/mitigation" estimate before revising his loss estimate. *Id.*, ¶ 35.

The parties dispute whether McCormack knew that Plaintiffs intended to demolish the building interior after the reinspection. ECF No. 114, ¶ 36; ECF No. 126, ¶ 36.

On November 10, 2020, six days after the second joint inspection, Stoycheff confirmed to Westfield by email that the next steps were ServiceMaster's preparation of a demo/mitigation estimate and Pumphrey's preparation of an engineer's report to enable McCormack to "complete his repair estimate." ECF No. 114, ¶ 37.

### C. Plaintiffs' "Gutting" of the Building

The parties do not dispute that Plaintiffs' remediation contractor, ServiceMaster, gutted the building and brought the building "down to the studs." ECF No. 114, ¶¶ 38–45. But they vigorously dispute when Westfield knew about the gutting. *See id.* The primary dispute boils down to Stoycheff's December 10, 2020 email to McCormack and Schmidt. ECF No. 126-3. Plaintiffs point to a single sentence in his email stating that "[d]emo and mitigation should be completed by the end of January." *Id.* McCormack responded that same day, suggesting that he would review the demolition and mitigation estimate and "bold the items I have issues with, [t]hen we can review over the phone." ECF No. 114, ¶ 60 (quoting ECF No. 114-40). Westfield argues that it understood that McCormack would review Stoycheff's estimate and Pumphrey's engineer's report, update his estimate, do a final walk-thru, and seek agreement on scope and price. *Id.*, ¶ 62. Moreover, on December 29, 2020, Stoycheff sought an update from Westfield without informing

Westfield that the building demolition would be complete by the following week. *Id.*, ¶ 63
(citing ECF No. 114-42).[3]

Plaintiffs take issue with McCormack's acknowledgement that he had received
Stoycheff's December 10 email, arguing that "McCormack never reached back out to
Stoycheff. And he never objected to the plan of action set forth by Stoycheff in the
December 10 email, nor did Schmidt object." ECF No. 126, ¶ 60; *id.*, ¶ 62. The parties
also quibble over the meaning of Stoycheff's testimony, when Westfield pressed him on
why he "didn't just write [that Plaintiffs] are proceeding with the mitigation of the structure
as per my estimate sent to [Westfield's representatives] on December 10, 2020." ECF
No. 126, ¶ 67. In response, he said, "I don't know why I didn't say that, but, you know,
*shame on me I suppose*." *Id.* (emphasis added).

The parties also dispute whether Plaintiffs should have hired an industrial hygienist
to test for smoke before gutting. To expand, Pumphrey recommended that the second
floor be fully investigated to determine the extent of smoke infiltration. *Id.*, ¶ 55.
Pumphrey's recommendation was for an industrial hygienist to test smoke samples, and,
according to Westfield, not to demolish or gut the entire second floor. *Id.*, ¶ 56. Contrary
to Pumphrey's recommendation, Plaintiffs did not hire an industrial hygienist to test for

---

[3] Plaintiffs dispute this fact, stating that "Stoycheff had *already* told Westfield the second-floor demo would begin after December 10 and would be completed by the end of January. Ex. 4, *December 10 email.*" The Court observes that Plaintiffs failed to provide a pincite to the 54-page email sent on December 10, 2020. The Court assumes that Plaintiffs reference is to Stoycheff's statement that "[d]emo and mitigation should be completed by the end of January." ECF No. 126-3 at 1. This statement, of course, could mean that the demo and mitigation has begun, or will begin shortly, and should be done by the end of the January based on the estimate. It could also mean that, because the fire occurred in July, the parties should work toward a goal to complete the demolition and mitigation by the end of January, but not that the work had already begun, or that will begin without Westfield's express approval. It is for the jury to weigh the credibility of the witnesses and decide this issue.

smoke before gutting the second floor of the building. *Id.*, ¶ 57. Plaintiffs admit these facts but argue that hiring an "industrial hygienist . . . would have added a cost and the damages were clear." ECF No. 126, ¶ 56. They also argue that the smoke testing was in addition to, not in lieu of, gutting. *Id.*, ¶ 57.

Westfield states that it learned the full extent of the gutting on February 2, 2021. ECF No. 114, ¶¶ 70–72. On February 4 and 8, 2021, Westfield sent Stoycheff letters memorializing its claim position, its decision to have a structural engineer inspect the property, and its request for the actual invoices of demo work performed by ServiceMaster for evaluation. *Id.*, ¶ 74. McCormack and Westfield's retained engineer, Brent Cornelison of BC Engineering, reinspected the Building with Stoycheff, Pumphrey, and ServiceMaster on February 22, 2021. *Id.*, ¶ 75. Upon observing the condition of the Building firsthand, McCormack objected to the extent of the demolition, particularly as to the second floor, and reminded Stoycheff that he had never approved of any further demolition following the November 4, 2020 reinspection, which Stoycheff acknowledged was "true." *Id.*, ¶ 76.[4] McCormack posited that there was no reason to demolish the building to that extent. *Id.*, ¶ 77; ECF No. 126, ¶ 77 (disputing "as to the accuracy" without citing to any record evidence).

Plaintiffs argue that "Stoycheff ***repeatedly*** advised McCormack and Schmidt that Plaintiffs were continuing to demo the Building, in emails dated December 10, January 19, and February 2, all without objection from Westfield or McCormack. Exs. 3, 13, 14."

---

[4] Plaintiffs dispute this fact, but they do so with no record evidence, arguing that "Westfield's position is that Plaintiffs were to do ***nothing*** for the three and a half months between McCormack's inspections (Nov. 4, 2020 and Feb. 22, 2021), although Stoycheff's December 10 email clearly stated that demo would continue." ECF No. 126, ¶ 76. This response does not dispute the fact set forth in Westfield's motion.

ECF No. 126, ¶ 78. The Court has already explained why it is not persuaded that the December 10 email unequivocally notified Westfield that Plaintiffs were demolishing the building. The January 19 email is even less persuasive. There, Stoycheff stated that "[t]hey are proceeding with the *proper mitigation* of the structure and should be done with that by the end of January." ECF No. 126-13 at 1 (emphasis added). Stoycheff does not clarify what he meant by proper mitigation. And although Stoycheff does clearly reference the demolition in his February 2, 2021 email—stating that the "insured's have completed the demo and should be done with mitigation soon," ECF No. 126-14 at 1–2—it is a stretch to say that Westfield did not object to that email. *See* ECF No. 114, ¶ 74.

### D. The Parties' Various Invoices and Payments

In March 2021, Stoycheff sent Westfield a new demo/mitigation estimate prepared by ServiceMaster using Xactimate, which Stoycheff labelled an "Xactimate invoice." ECF No. 114, ¶ 79. Plaintiffs admit that he referred to the document as an invoice but argue that it was self-evident that it was an estimate. ECF No. 126, ¶ 79. The parties agree that the invoice, or estimate, contained errors, such as "double billing on interior walls." ECF No. 114, ¶ 83. But they dispute who caused the errors: Westfield points to ServiceMaster; Plaintiffs point to McCormack. ECF No. 114, ¶ 83; ECF No. 126, ¶ 83.

On April 5, 2021, McCormack sent Westfield a supplemental report with a revised RCV loss estimate of $196,456.95 and $25,102.68 in recoverable depreciation. ECF No. 114, ¶ 84; *see also* ECF No. 117, ¶ 61 (stating that McCormack sent his updated estimate on April 6, 2021, not April 5); *id.* (stating that his estimate for ACV was $171,354). McCormack also stated that Stoycheff's demo/mitigation estimate "include[d] items not

9

damaged by the fire" and was "not a fair representation of the work required to prepare the loss for fire damaged repairs." ECF No. 114, ¶ 86. McCormack noted that Pumphrey's engineer's report did not mention "stripping the building to the studs to facilitate the repairs." *Id.*, ¶ 87. Plaintiffs do not dispute that Pumphrey's engineer's report omitted this, but they argue that McCormack was fully aware that a full gut based on the December 10 email. ECF No. 126, ¶ 87.

On April 19, 2021, Stoycheff sent Westfield a $1.196 million Conceptual Estimate "to repair the building to pre-loss conditions" and requested "the policy limits in full based off the facts and documentation that we have provided previously." ECF No. 114, ¶ 94. Plaintiffs admit that they hired HLCC Construction Company as their general contractor and requested that HLCC prepare the Conceptual Estimate in January 2021, which included two exterior items unaffected by the fire. ECF No. 126, ¶ 95. Plaintiffs argue, however, that these items were clearly identifiable in the estimate and de minimis in value ($76,559). *Id.*

McCormack submitted a revised estimate on June 2, 2021. ECF No. 114, ¶ 106. He estimated the RCV of building loss as $273,115.32 with $29,616.81 in recoverable depreciation. *Id.* The same day, Westfield issued an additional $72,144.24 ACV payment on the building loss based on McCormack's revised estimate—which Plaintiffs note was eleven months after the fire. ECF No. 126, ¶ 107.

### E.    Plaintiffs' Loss of Rents Claim

While Stoycheff pursued JME's building loss claim, Kalon deLuise of Adjusters International pursued a claim for JME's loss of monthly rental income from Hiway Bar's

lease of the first floor. ECF No. 114, ¶ 108. On July 26, 2020, two weeks after the fire, Matthew Elam informed Scott deLuise of Adjusters International that "[t]here isn't a formal lease due to the common ownership but we are talking to our attorneys about how to draw one up." *Id.*, ¶ 109. A few weeks later, Kalon deLuise asked John Elam to send him the JME–Hiway Bar lease to support the Loss of Rents Claim. *Id.*, ¶ 110. John Elam responded by sending an unsigned version of a document titled "Commercial Lease" between the Hiway Bar and JME. *Id.*, ¶ 111. On August 20, 2020, five weeks after the fire, Matthew Elam emailed John Elam a partially executed signature page for the Commercial Lease. *Id.*, ¶ 112. And on October 6, 2020, Kalon deLuise sent Westfield a "Lost Rent Package" in support of JME's Loss of Rents Claim that included a signed version of the Commercial Lease. *Id.*, ¶ 113. Plaintiffs admit that Kalon deLuise did not disclose that the lease had been prepared after the fire, but they note that it is undisputed that "Westfield paid the exact amount of the lost rents claim and not a penny more." ECF No. 126, ¶ 113.

The parties agree that the Commercial Lease stated that it was "entered into this 1st day of January, 2020," and that it was dated January 1, 2020. ECF No. 114, ¶ 114. Matthew Elam admitted that the Commercial Lease was drafted and signed after the fire occurred, but he explained that he did that merely "to show the start of the year." ECF No. 126, ¶ 115. He testified that the lease was not "backdated," as Westfield argues, but rather dated January 1, 2020 "to memorialize the verbal agreement that we always had." *Id.*

Westfield paid the Loss of Rents claim at a rate of $4,000 per month for a period of 12 months from the date of loss, for a total of $48,000.00—reflecting the maximum allowed under JME's Policy. ECF No. 114, ¶ 118.

### F.    Loss Appraisal and Westfield Total Payments

After issuing the June 2, 2021 ACV payment on the building loss, Westfield did not hear from Plaintiffs or their representatives until September 3, 2021, when Plaintiffs' counsel sent a letter to Westfield demanding payment of over $800,000 for the building loss and other previously unasserted claims. ECF No. 114, ¶ 120. Following exchanges of correspondence regarding settlement of this matter, in September of 2021, Westfield requested binding appraisal. ECF No. 117, ¶ 66. Under this process, which is part of the JME policy, both JME and Westfield select an appraiser, and a third appraiser (referred to as an umpire) could also be selected if the two party-appointed appraisers could not agree on a value. *Id.*, ¶ 67. Here, on January 31, 2022, roughly one and a half years after the fire, the two party-appointed appraisers agreed on the value of the loss, negating the need for an umpire. *Id.*, ¶ 68. The appraisers agreed that the RCV repair value for the building was $875,000 and the ACV repair value was $612,500. *Id.* As the parties point out, this value exceeded the $625,500 building limit in the JME policy but was $627,000 less than Plaintiffs' estimate of the loss.

Westfield argues that Plaintiffs' appraiser Richard Glavich improperly relied on documents from Plaintiffs estimating the building loss at $1,501,783. *Id.*, ¶ 130. On February 18, 2022, Westfield issued a $369,001.49 ACV payment pursuant to the appraisal award, bringing its total payment on JME's building loss claim to $607,500

($612,500 less a $5,000 deductible).[5] *Id.*, ¶ 133. Including amounts paid to Hiway Bar, Westfield has paid Plaintiffs a total of $917,037.24 on their claims arising from the fire loss. *Id.*, ¶ 134.

## II.    LEGAL STANDARDS

### A.  Federal Rule of Civil Procedure 56

Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Ledbetter v. City of Topeka*, 318 F.3d 1183, 1187 (10th Cir. 2003) (internal quotations and citation omitted); Fed. R. Civ. P. 56. The factual record and reasonable inferences must be construed in the light most favorable to the nonmoving party. *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006). The moving party bears the initial burden, but once met, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 256 (1986). Ultimately, the Court's inquiry on summary judgment is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

---

[5] Westfield provides an itemized breakdown of the payments it made to JME and Hiway Bar, totaling $917,037.24. *See* ECF No. 114, ¶ 134.

### B. Federal Rule of Evidence 702

The recently amended Rule 702 of the Federal Rules of Evidence, which governs the testimony of expert witnesses, provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702 (as amended on Dec. 1, 2023). Where, as here, a party challenges the admissibility of an expert witness, Rule "702 imposes upon the trial judge an important gate-keeping function with regard to the admissibility of expert opinions." *Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297, 1307 (10th Cir. 2015) (citation and quotation omitted). The proponent of expert testimony bears the burden—by a preponderance of evidence—of showing admissibility. Fed. R. Evid. 702; *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009).

To evaluate admissibility, the Court engages in a "two-step analysis." *Roe v. FCA US LLC*, 42 F.4th 1175, 1180 (10th Cir. 2022). First, the Court must decide whether the proffered expert is qualified "by knowledge, skill, experience, training, or education" to render the opinion. Fed. R. Evid. 702; *see also Roe*, 42 F.4th at 1180. Second, if the expert is sufficiently qualified, the Court must determine whether the proffered opinions

are reliable. *Roe*, 42 F.4th at 1180–81. "The reliability inquiry asks whether the methodology employed by an expert is valid—that is, whether it is based on sufficient data, sound methods, and the facts of the case." *Id.* at 1181 (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)). The Court also evaluates whether the expert reliably applied the methodology to the facts of the case. *Id.*

Experience alone may provide a sufficient foundation for expert testimony, but a witness relying solely on experience must "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's notes to 2000 amendment. The Court's "gatekeeping function requires more than simply taking the expert's word for it." *Id.* (citation and quotation omitted). The Court has substantial discretion to determine "*how* to perform its gatekeeping function under *Daubert*." *Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 770 (10th Cir. 2019) (emphasis in original); *see also Roe*, 42 F.4th at 1180.

### III.    ANALYSIS & ORDER

The Court will address Westfield's motion for summary judgment, Plaintiffs' motion for summary judgment, and Westfield's motion to exclude in turn.

### A.    Westfield's Motion for Summary Judgment

Westfield argues that Plaintiffs violated the cooperation and fraud clauses of their insurance policies and thus coverage is voided. ECF No. 114 at 24–28. Westfield points to three examples. First, Westfield argues that Plaintiffs and their public adjuster, Stoycheff, concealed from Westfield that Stoycheff gave Plaintiffs and their vendors the

approval to fully gut the building after the November 4, 2020 reinspection. *Id.* at 25. Second, Westfield argues that, rather than cooperate with Westfield's multiple requests for invoices reflecting the actual work performed, Stoycheff had ServiceMaster prepare a new estimate, which he inaccurately called an "invoice." *Id.* at 27. Westfield contends that the ServiceMaster estimate included work not performed, double-billed certain items, and reflected different pricing than ServiceMaster's actual invoices. *Id.* Third, Westfield points to the Commercial Lease that was drafted and signed after the fire, which Adjusters International submitted to Westfield to substantiate JME's Loss of Rents Claim. *Id.* at 28.

Westfield argues that these "concealments and misrepresentations" advance Plaintiffs' goal of recovering as much as possible from Westfield. *Id.* It goes on to argue that, because of Plaintiffs' alleged breaches, there can be no finding that Westfield acted in bad faith. *Id.* at 30. Thus, according to Westfield, Plaintiffs' affirmative claims fail as a matter of law, and Plaintiffs' violations of the policies' cooperation and fraud clauses entitle Westfield to judgment on its counterclaims for declaratory judgment, breach of contract, and recoupment. The Court is not persuaded.

The three material facts outlined above are *not undisputed* as Westfield contends; instead, Plaintiffs refute each one. First, rather than conceal the gut job on the building, Plaintiffs argue that Stoycheff told Westfield about Plaintiffs' intention in his December 10, 2020 email to McCormack and Schmidt. *See, e.g.,* ECF No. 126, ¶¶ 36, 38, 42–43, 46. Second, whether ServiceMaster prepared an invoice or an estimate, and which party is to blame for the inaccurate items in the invoice, is plainly disputed. *See, e.g.,* ECF No. 126, ¶ 83. Finally, whether Plaintiffs backdated the Commercial Lease or merely

memorialized a verbal agreement is a genuine fact dispute that cannot be decided at this stage. *See, e.g.,* ECF No. 126, ¶ 115.

In sum, whether Plaintiffs perpetrated a fraud or cooperated with Westfield in its investigation of the fire is a question of fact for the jury to determine. Accordingly, the Court denies Westfield's motion for summary judgment in its entirety.[6]

## B.    Plaintiffs' Motion for Summary Judgment

At the highest level, Plaintiffs argue that Westfield's counterclaims fail as a matter of law because "the record reflects that there was never any intent to induce Westfield to pay more than the loss sustained," and thus, Westfield cannot prove that Plaintiffs breached the fraud clause provision. ECF No. 117 at 1. The Court disagrees with Plaintiffs at this stage of litigation.

Plaintiffs first argue that Westfield's counterclaims are barred by the doctrine of laches.[7] "The elements of laches are: (1) full knowledge of the facts; (2) unreasonable

---

[6] Westfield goes on to argue that summary judgment is warranted "as to certain insurance benefits that Plaintiffs cannot establish are owed." ECF No. 114 at 31. Each of these brief arguments are undeveloped and concern material facts that are in dispute. Westfield also argues that judgment on Counts II and III are warranted in addition to the cooperation and fraud arguments. ECF No. 114 at 34–40. Westfield's argument is that Plaintiffs cannot show that Westfield engaged in unreasonable delay or unreasonably denied payment—essentially arguing that it acted reasonably. *Id.* Whether Westfield acted reasonably under the facts presented is a question for the jury to decide.

[7] Neither party addresses whether the Court should apply federal or state law when analyzing Plaintiffs' laches argument. Plaintiffs rely on a single case—*Biodiversity Conservation All. v. Jiron*, 762 F.3d 1036 (10th Cir. 2014). That case, however, concerned two federal statutes and thus did not invoke diversity jurisdiction. *Id.* at 1049 ("Two sources of statutory and regulatory law govern this case: (1) the National Forest Management Act of 1976 ('NFMA'); (2) the National Environmental Protection Act of 1969 ('NEPA'); and both acts' implementing regulations."). For its part, Westfield relies on *Ute Indian Tribe of Uintah & Ouray Rsrv. v. Probst*, 428 F.2d 491 (10th Cir. 1970)—a case involving 28 U.S.C § 1362 and 25 U.S.C § 677. The Tenth Circuit has determined that state substantive law governs the defenses of laches. *Bechler v. Kaye*, 222 F.2d 216, 219 (10th Cir. 1955); *see also Sumrall v. LeSea, Inc.*, 104 F.4th 622, 629 (7th Cir. 2024) ("This difference between state and federal laches law implicates the *Erie* doctrine, which calls on federal courts applying state law to use state substantive law and federal procedural rules. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010). Laches—just like a statute of limitations—is substantive."). Thus, in its limited analysis, the Court will apply Colorado substantive law.

delay in the assertion of available remedy; and (3) intervening reliance by and prejudice to another." *Gen. Elec. Co. v. Galbiati*, No. 13-cv-02053-RPM, 2015 WL 1186438, at *5 (D. Colo. Mar. 12, 2015) (quoting *Hickerson v. Vessels,* 316 P.3d 620, 623 (Colo. 2014)). "Whether the elements of laches have been established is a question of fact." *Keller Cattle Co. v. Allison*, 55 P.3d 257, 260 (Colo. App. 2002). "A party asserting laches as a basis for summary judgment must establish that no genuine issue of material fact remains, that the other party unreasonably delayed the proceedings, and that such delay caused substantial prejudice." *Id.* Plaintiffs cannot make this showing.

To start, Plaintiffs essentially rehash the arguments they presented in their opposition to Westfield's motion for leave to amend to file an amended answer. The Court granted Westfield's motion for leave over Plaintiffs' objections, finding that Westfield's request for leave was appropriate. ECF No. 88. More fundamental are the various fact disputes outlined above concerning when Westfield learned of the purported fraud. Courts in this District have permitted insurers to assert counterclaims midway through litigation to avoid allegations from insureds concerning "overly aggressive litigation tactics by an insurance company." *Wheatridge Off., LLC v. Auto-Owners Ins. Co.*, No. 19-CV-00487-RM-MEH, 2020 WL 1433502, at *4 (D. Colo. Mar. 24, 2020) (despite the record establishing that the defendant had some knowledge of the issues with damage estimates and preexisting damage early in the case, not "fault[ing] Defendant for proceeding cautiously in asserting counterclaims until sufficient evidence is generated in discovery to justify such claims").

The Court cannot conclude as a matter of law that "Westfield knew all of the facts underlying its counterclaims well before this case began," as Plaintiffs contend. ECF No. 117 at 25. The Court therefore denies Plaintiffs' request to bar Westfield's counterclaims on laches grounds.

Plaintiffs next argue that Westfield's counterclaims premised on the fraud clause fail as a matter of law. ECF No. 117 at 26. They attack six alleged misrepresentations. *Id.* at 26–33. For the reasons already stated, the Court finds genuine fact disputes prohibit the granting of summary judgment on this issue. The Court highlights three of these alleged misrepresentations. First, Plaintiffs contend that they neither misrepresented nor concealed the "full gut" demolition. *Id.* at 27. Plaintiffs point to Stoycheff's December 10, 2020 email as evidence. Setting aside that the December 10 email did not unequivocally notifiy Westfield that Plaintiffs were demolishing the building, Westfield points out that the evidence shows that the full gut demolition actually began five weeks before Stoycheff sent the December 10 email. ECF No. 125 at 28. Plaintiffs, without citing any support, argue that this is "untrue." ECF No. 124 at 12; *see also id.* at 12 n.3 (distinguishing Westfield's "sole factual source," arguing that there is no mention of a "full gut" job but rather mentioning the "demolition"). The parties' argument displays the factual disputes concerning this issue.

Second, Plaintiffs contend that the alleged "backdated" lease was not a misrepresentation or concealment. ECF No. 117 at 28–29. The Court rejects Plaintiffs' argument on this issue for the same reason it denied Westfield's: whether Plaintiffs improperly backdated the Commercial Lease or merely memorialized a verbal agreement

is a genuine fact dispute for the jury to decide. And third, Plaintiffs argue that the rebuild estimate, although it may have contained inaccuracies or line items not damaged by the fire, was not a misrepresentation. ECF No. 117 at 20–30. This issue too is rife with fact disputes. As Westfield notes, even Plaintiffs' claims-handling expert admitted that it "would certainly [have been] better to disclose" that the estimate included items not directly related to the loss. ECF No. 125 at 32. For these reasons, the existence of genuine fact disputes concerning the fraud clause make summary judgment inappropriate on Westfield's counterclaims.

Plaintiffs next argue that Westfield can present no evidence that Plaintiffs failed to cooperate with Westfield. ECF No. 117 at 33–35. Plaintiffs continue to argue that they told Westfield all along that they were demolishing the building, concluding that "Plaintiffs did not *materially* conceal anything." *Id.* at 35 (emphasis added). Westfield argues that Plaintiffs' cooperation clause argument requires ignoring the evidence establishing that Plaintiffs proceeded with the full gut weeks before informing Westfield, and thus, there is evidence that Plaintiffs failed to cooperate. ECF No. 125 at 36–37. Like all the issues before, whether Plaintiffs cooperated with Westfield in its investigation is a factual issue the jury must decide.

Plaintiffs' final argument is that Westfield is precluded from making any counterclaim relating to the amount of damages or the need for a "full gut" demotion of the building because the insurance appraisal is binding on the parties. ECF No. 117 at 35–37. Stated differently, Plaintiffs contend that the appraisers' determination is preclusive of the amount or value of the Plaintiffs' loss ($875,000 in RCV). *Id.* at 36.

Plaintiffs further argue that the appraisers necessarily resolved the "full gut" issue. *Id.* at 37 ("Due to the size of their award, the appraisers necessarily understood that a 'full gut'— full demolition—had been necessary to establish the extent of the fire damage.").

In response, Westfield argues that appraisal awards "are not as preclusive as arbitration." ECF No. 125 at 38. Westfield relies *Andres Trucking Co. v. United Fire & Cas. Co.*, 488 P.3d 425 (Colo. App. 2018). There, the Colorado Court of Appeals noted that an appraisal provision, which the parties agree is identical to the one in the JME policy, "did not purport to be a mechanism for resolving other disagreements between the parties" and "expressly preserved to [the insurer] the right to contest liability, notwithstanding the parties' participation in the appraisal process." *Id.* at 430. *Andres* distinguished between appraisal and arbitration: "Judgment does not follow directly from an appraisal because, unlike arbitration, the function of an appraisal award is not to determine the merits of any claim." *Id*. Westfield explains that it does not seek to overturn the appraisal award. ECF No. 125 at 39. Rather, Westfield asserts that Plaintiffs breached the policies' fraud and cooperation clauses before the building loss was submitted to appraisal, and these breaches—particularly the concealment of the full gut—enabled Plaintiffs to gain an advantage in the appraisal. *Id.*

Based on the facts presented to the Court, the Court cannot conclude as a matter of law that the appraisal award precludes Westfield's counterclaims. The Court further observes that Plaintiffs failed to reply to Westfield's arguments, thus waiving the issue. *Est. of Burnett v. City of Colorado Springs*, No. 21-CV-1708-WJM-MDB, 2025 WL 71660, at *11 (D. Colo. Jan. 10, 2025) ("[T]he Court finds the Officers have abandoned the

argument by failing to address the Estate's arguments in reply."); *see also Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) (failure to respond to an argument in a response brief results in waiver).

Accordingly, the Court denies Plaintiffs' motion for summary judgment in its entirety.

**C.    Westfield's Motion to Exclude Opinions and Testimony of Damian Arguello**

Plaintiffs retained Arguello to evaluate and opine as to whether Westfield's handling of Plaintiffs' insurance claims was consistent with industry standards. ECF No. 124 at 1. Arguello, an attorney, submitted two expert reports in this matter. On March 10, 2023, he submitted his initial, affirmative report. ECF No. 116-1. Over a year later, on May 15, 2024, Arguello submitted a supplemental expert report to address certain issues raised in Westfield's counterclaims. ECF No. 116-2.

Westfield contends that Arguello's initial report, submitted in connection with Plaintiffs' common law bad faith claim, is littered with factual inaccuracies and improper legal conclusions. Westfield argues that various opinions in his report are highly unreliable, prejudicial, and unhelpful to the jury. Westfield also takes issue with Arguello's supplemental report in which, according to Westfield, Arguello improperly speculates about Westfield's motivation for asserting its counterclaims, including that Westfield filed the counterclaims to "distract the factfinder's attention from Westfield's deficient claim handling," and that Westfield sought to "perpetuate[] this litigation by raising its counterclaims extremely late in the litigation[.]" ECF No. 116 at 9 (quoting ECF No. 116-2).

As required by the Court's Uniform Practice Standards,[8] Westfield recites the 10 opinions in Arguello's affirmative report that Westfield contends are improper due in part to the "litany of factual errors" predicating these opinions. *See* ECF No. 116 at 7–8. Having analyzed these 10 opinions, the Court declines to exclude them at this time. The Court has already outlined the numerous factual disputes in this matters. Westfield can challenge any perceived factual errors that Arguello relied on during its cross examination of the expert. The Court's role as a gatekeeper under *Daubert* "is not intended to serve as a replacement for the adversary system." Fed. R. Evid. 702 advisory committee's notes to 2000 amendment (quoting *United States v. 14.38 Acres of Land Situated in Leflore Cnty., Miss.*, 80 F.3d 1074, 1078 (5th Cir. 1996)). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993).

Westfield next challenges Arguello's claims-handling opinion in which he states, "[i]n my opinion, Westfield's handling of JME's and Hiway's claims failed to meet applicable standards of care for a reasonable insurer under the facts and circumstances of this loss." ECF No. 116 at 8 (quoting ECF No. 116-1 at 23). The Court counseled the parties at the Final Pretrial Conference on January 17, 2025, that it will permit Arguello to testify, consistent with his expertise in the insurance industry, about the relevant insurance industry standards concerning an insurer's duty to investigate claims, including

---

[8] "All motions filed under Rule 702 shall include the expert witness's report as an exhibit and specify, with particularity, the opinion(s) that the moving party seeks to exclude and the specific ground(s) on which each opinion is challenged, e.g., relevancy, sufficiency, or methodology." CNS Civ. Practice Standard 7.1C(b).

whether Westfield's conduct was consistent with that of a reasonable insurer. Such testimony is common in this District. *Masters v. Safeco Ins. Co. of Am.*, No. 20-CV-00631-PAB-NRN, 2021 WL 4317112, at *7 (D. Colo. Sept. 23, 2021); *O'Sullivan v. Geico Cas. Co.*, 233 F. Supp. 3d 917, 929 (D. Colo. 2017) ("Mr. Torres may testify as to insurance industry standards, which may include his testimony and opinions explaining how he believes Geico's conduct differed from the conduct of other insurers or fell short of industry standards. Mr. Torres may not, however, offer ultimate legal opinions. . . . The Court will therefore exclude opinions of Mr. Torres that Geico's conduct was unreasonable or insufficient as a matter of law, or was in violation of any statute."); *see also Peden v. State Farm Mut. Auto. Ins. Co.*, 841 F.3d 887, 890 (10th Cir. 2016) (the reasonableness of an insurer's investigation of a claim may be determined by expert opinion); *Goodson v. Am. Standard Ins. Co. of Wisconsin*, 89 P.3d 409, 415 (Colo. 2004).

But Arguello may not go any further by testifying that Westfield's handling of Plaintiffs' claim was unreasonable. Expert testimony must be helpful to the jury. Fed. R. Evid. 702(a). To ensure testimony is helpful, "[a]n expert may not state legal conclusions drawn by applying the law to the facts, but an expert may refer to the law in expressing his or her opinion." *United States v. Richter*, 796 F.3d 1173, 1195 (10th Cir. 2015) (quoting *United States v. Bedford*, 536 F.3d 1148, 1158 (10th Cir. 2008)). "The line between a permissible opinion on an ultimate issue and an impermissible legal conclusion is not always easy to discern." *Id.* (quoting *United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006)). Here, the Court finds that the challenged opinion goes right up to, but does not cross, that thin line. Plaintiffs are warned, however, to stay clear of this line during trial.

24

Westfield then challenges seven opinions from Arguello's supplemental report that Westfield argues constitute improper legal conclusions. *Id.* at 11–12. For example, Arguello stated, "[i]n my opinion, *the available evidence doesn't support Westfield's counterclaims.*" ECF No. 116-2 at 2 (emphasis added). Another example is his statement that, "in my opinion, Plaintiffs provided ample cooperation with Westfield's investigation[.]" *Id.* at 9.

Unlike the 10 opinions challenged on factual grounds, Plaintiffs do not address any of these seven opinions with specificity in their response. Plaintiffs instead assert high-level arguments that Arguello's opinions are "properly grounded in the standard of care for insurance claims handlers and are relevant to the determination of materiality." ECF No. 124 at 12. Plaintiffs argue that this post-litigation conduct is relevant to Westfield's on-going duty of good faith and fair dealing. The Court is not persuaded.

True, an insurer's "duty of good faith and fair dealing continues unabated during the life of the insurer-insured relationship, including through a lawsuit or arbitration between an insured and the insurer." *Masters*, 2021 WL 4317112, at *7 (quoting *Sanderson v. Am. Fam. Mut. Ins. Co.*, 251 P.3d 1213, 1217 (Colo. App. 2010)); *see also Parsons*, 165 P.3d at 815 ("[T]he tort of bad faith breach of an insurance contract encompasses all of the dealings between the parties, including conduct occurring after the arbitration procedure." (citation and quotations omitted)). But Arguello's opinions, especially his opinion that the evidence does not support Westfield's counterclaims, clearly are improper. This type of testimony will invade the province of the jurors, who will be tasked with evaluating whether the evidence supports Westfield's counterclaims.

25

*See O'Sullivan*, 233 F. Supp. 3d at 928 (an "expert witness's testimony may not usurp the jury's fact-finding function").

Finally, the Court questions how Arguello could speculate as to Westfield's rationale and motivation for filing its Counterclaims. Such testimony would be inherently unreliable. Further, as Westfield explains, the Court was well-informed of the timing of Westfield's counterclaims when it determined that good cause existed to permit Westfield leave to amend its answer to bring the counterclaims. ECF No. 88. Arguello's opinion appears to question the Court's ruling, which is another reason his counterclaims opinions are impermissible.

## V. CONCLUSION

Consistent with the above analysis, the Court DENIES the parties competing motions for summary judgment, ECF Nos. 114, 117, and GRANTS in part and DENIES in part Westfield's Motion to Exclude Opinions and Testimony of Damian J. Arguello, ECF No. 116.

DATED this 30th day of January 2025.

BY THE COURT:

_____
Charlotte N. Sweeney
United States District Judge