**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

Case No.: 1:22-cv-01012-CNS-JPO

JME INVESTMENTS, LLC, a Colorado Limited Liability Company, and HIWAY BAR, LLC, a Colorado Limited Liability Company,

      Plaintiffs,

      v.

WESTFIELD INSURANCE COMPANY, an Ohio Corporation,

      Defendant.

---

## PLAINTIFFS' RESPONSE TO DEFENDANT WESTFIELD'S MOTION *IN LIMINE*

### Introduction

With respect to motions *in limine*, as a general rule, "it is the better practice to wait until trial to rule on objections when admissibility substantially depends upon what facts may be developed there." *Starling v. Union Pacific R. Co.*, 203 F.R.D. 468, 482 (D. Kan. 2001)). Further, a motion *in limine* should only be granted when the evidence at issue is not admissible under any possible theory at trial. *Hawthorne Partners v. AT & T Techs., Inc.*, 831 F.Supp. 1398, 1400 (N.D. Ill. 1993). At least some of the evidence that Defendant seeks to preclude is better left for the full context of trial, such as evidence regarding "litigation conduct" and the parties' respective motives. With this caveat, Plaintiffs hereby respond to Defendant's motion *in limine* (the "Motion") as follows.

### Discussion

**1.    Plaintiffs agree that they will not call Mr. Behrens.**

Plaintiffs agree that Mr. Behrens would be cumulative to the expected testimony of Public Adjuster Michael Stoycheff (Motion, at 2); they will not call Mr. Behrens to testify in their case-in-chief (and only on rebuttal if warranted by circumstances in the case).

1

**2.** **In a separate claim in Colorado (Greystoke), Defendant Westfield, utilizing the _same_ building consultant, engaged in the _same_ lowballing and a similar improper use of Xactimate, which evidence falls within the permitted uses in Evidence Rule 404(b)(2), including for the punitive damage claim.**

At virtually the same time as Westfield's and Grecco's delays and denials here, Westfield and Grecco were engaging in virtually identical conduct involving a Denver fire loss suffered by the Greystoke condominium complex.

Comparing the Westfield and Grecco conduct in the two cases, it is hard to imagine a factual scenario that would match much more closely. Both were fire losses, and we have the same insurance carrier (Westfield), the same building consultant (Grecco), the same Public Adjuster (Mr. Stoycheff), the same pattern of lowballing, the same improper use of Xactimate, and the same Appraiser **for Westfield** (Scott Markey), who rebuffed the lowballing by Westfield and Grecco in both cases, without the need for an Umpire.

For instance, the fire loss in Greystoke was on 12/21/19 and the first Grecco estimate (**Exhibit 1**) was dated 1/10/20 and was for just $469,947.36 RCV, without an ACV number (because the estimates are voluminous, and since Westfield already has them, we are attaching highlighted copies of the first and second pages of each, and the summary page showing the RCV and ACV numbers). The second estimate from Grecco (**Exhibit 2**) was dated 3/3/20 and the numbers had gone up to $608,450.29 RCV and $481,921.84 ACV. The third Grecco estimate (**Exhibit 3**) was dated 11/13/20 and the numbers had increased to $783,954.65 RCV and $712,142.71 ACV. Then, after a higher but still lowballed estimate from another Westfield consultant, the Appraisal Award by Mr. Markey and the insured's Appraiser (**Exhibit 4**) was $1,906,717.35 RCV and $1,803,754.62 ACV.

Also, just as the COVID price increases were occurring during the lowballing in this JME case, because the Greystoke claim was in the same time frame, the same price increases were relevant to that claim as well. Yet the Greystoke estimates from Grecco

2

all reflect a dogged insistence on using a price list from the December 2019 date of loss and refusing to recognize the rapidly rising prices due to COVID (on page 1 of each estimate, the "Price List" is identified as "CODE8X_DEC19" -- which translates as a Denver price list for December of 2019). Thus, the last Grecco estimate (**Exhibit 3**) was done on 11/13/20 (well after the 2/20 start of COVID) and yet it was still using a 12/19 price list. **Exhibit 5** is a chart that shows the timing and the amounts of the lowballing in both claims, versus the ultimate Appraisal Award by Mr. Markey, Westfield's Appraiser.

In the subsequent *Greystoke* lawsuit, Westfield (represented by Mr. Lacks, its counsel in this case) deposed Mr. Stoycheff, in part, ***about the JME case***, without providing notice to undersigned counsel (*i.e.*, counsel for JME). *See Excerpt of Stoycheff transcripts from Greystoke case* (**Exhibit 6**) (highlighted for ease of reference). This questioning reflected a recognition that the two cases share a level of commonality.[1]

The *Greystoke* case is relevant for all three aspects of this case: Plaintiffs' case-in-chief, Plaintiffs' defense to Westfield's counterclaim, and punitive damages. Evidence Rule 404 provides that other acts are generally not admissible to prove character but that such "evidence may be admissible for another purpose, such as proving ***motive***, opportunity, ***intent***, preparation, plan, knowledge, identity, ***absence of mistake, or lack of accident***." **Fed.R.Evid. 404(a), (b)** (emphasis added). "Because rule 404(b) is

---

[1]     Given Westfield's position that Mr. Stoycheff was the JME Plaintiffs' agent, it was improper for Westfield's attorney in *Greystoke* (the same attorney as in this case) to question Mr. Stoycheff in the Greystoke case ***about JME*** without notice to JME's attorneys. Among other things, Mr. Stoycheff was questioned in his Greystoke deposition about whether his work on the JME claim caused him to have "negative" views of Westfield and Grecco, *see id.* at 18, 35, his perception of the appraisal process in the JME case, *id.* at 276-77, and possible referral fees in the JME matter, *id.* at 283-84 (there were none, of course). It was improper for Westfield to depose the JME Plaintiffs' Public Adjuster in a separate case with no notice to or representation by JME's counsel

applicable to all persons, not just criminal defendants, the same general rule applies in the civil context as well." *Montoya v. Vill. of Cuba*, No. CIV 11-0814 JB/SMV, 2013 WL 6503702, at *13 (D.N.M. Nov. 30, 2013). The Tenth Circuit has recognized the probative value of uncharged, unrelated acts to show motive, intent and knowledge, whether the acts involved previous conduct or conduct subsequent to the charged offense, if the other acts are similar to the charged crime and sufficiently close in time. *See United States v. Olivo*, 80 F.3d 1466, 1468-69 (10th Cir. 1996) (also finding that the Rule 404(b) issue "involves a case-specific inquiry that is within the district court's broad discretion"). *See also United States v. Bonnett*, 877 F.2d 1450, 1461 (10th Cir. 1989) (under Rule 404(b), evidence of other acts "may be admissible to show knowledge, motive or intent on the part of the actor" and "[t]he closeness in time and the similarity in conduct were matters best left to the trial court's, and [its] discretion will not be reversed absent a showing of abuse of discretion"). Applying this Tenth Circuit case law here, as noted above, the conduct of Westfield and Grecco in both claims was remarkably similar, and the timing was basically overlapping, with the same exact "players."

Insurance companies are not immune from the provisions of Rule 404(b). In *Le v. State Farm Fire & Cas. Co.*, 676 F.Supp.3d 760 (D. Ariz. 2023), the district court applied a Rule 404(b) analysis to a bad faith case, stating:

> "An insurer acts in bad faith when it unreasonably investigates, evaluates, or processes a claim (an 'objective' test), and either knows it is acting unreasonably or acts with such reckless disregard that such knowledge may be imputed to it (a 'subjective' test)." [Citation omitted.] ***If these other claims or lawsuits are sufficiently similar to the case at bar, a reasonable trier of fact could find that State Farm engages in a pattern or practice of lowballing*** homeowners when their claims are initially adjusted and frustrating the process when the homeowners demand an appraisal.

*Id*.at 763-64 (emphasis added). Notably, in the *Le* case, when the Arizona federal Court allowed the "other act" evidence, it noted that the insurer's "handling of other claims and lawsuits could be relevant to show that State Farm intentionally injured the plaintiffs [relevant to bad faith] or consciously pursued a course of conduct knowing that it 'created a substantial risk of significant harm' to the plaintiffs" (relevant to punitive damages).

The similarities between this JME claim and the Greystoke claim are stark. They both involved a fire, only months apart, in the same general area. They also involved the same insurer, the same building consultant, similar "gamesmanship" with regard to the use of Xactimate price lists (although the manipulation was worse here), and the same pattern of starting with an outrageously low estimate and going up only incrementally, and then demanding Appraisal—and, most critical of all, in both claims, Westfield's own Appraiser (Mr. Markey) rebuffed the obvious lowballing. The Greystoke evidence certainly has a "tendency" (*see* Rule 401) to show intent, motive, an absence of mistake, and the lack of an accident. This evidence also rebuts Westfield's claim that it was Plaintiffs, rather than Westfield's own conscious choices, that delayed this matter. And Mr. Stoycheff can testify to both claims. This evidence should be relevant and admissible under Rule 404(b).

The Greystoke evidence is also admissible for purposes of punitive damages. In *Le*, *supra*, the district court observed that defendants rarely admit to the requisite "evil mind" for punitive damages, and, therefore, "whether the defendant intended to injure the plaintiff or consciously disregarded the plaintiff's rights may be suggested by a pattern of similar unfair practices." *Le*, 676 F.Supp.3d at 765.

**3.  Just as Westfield intends to discuss the Plaintiffs' <u>alleged</u> effort to "set up" the bad faith claim, so too is it relevant to show Westfield's efforts to "set up" its counterclaim; however, these issues are best dealt with at trial.**

Plaintiffs' position on the litigation conduct issue is that it is far too nuanced to be resolved through an 8-page omnibus motion *in limine*, and it should be addressed at trial.

5

The need to deal with this issue in the full context of trial is demonstrated by the competing positions here. As reflected in Westfield's proposed jury instructions, and its reliance (*see* Motion, at 5) on *Cribari v. Allstate Fire & Cas. Ins. Co.*, No. 16-CV-02450-NRN, 2019 WL 2436045 (D. Colo. June 11, 2019), *aff'd*, 861 F. App'x 693 (10th Cir. 2021), Westfield seeks to transform this matter into a "set up" case, where, supposedly, the Plaintiffs, being underinsured, sought to "'set up' [the insurer] for a bad faith lawsuit by intentionally withholding information that would have allowed [the insurer] to evaluate the claim fairly and promptly." *Cribari,* at *1.

Under the jury instructions submitted by Westfield, if Westfield proves even a single instance of noncooperation or misrepresentation, then it is not only completely absolved of its own bad faith, but it can recover all amounts already paid—even if (1) Westfield did not rely on any misrepresentation or noncooperation, and (2) Plaintiffs did not make any alleged misrepresentation with an intent to induce Westfield to pay more than it was required to under the insurance contract. *See* **Exhibit 7,** *Westfield Non-Stipulated Instructions re (1) Detrimental Reliance & Pursuit of Excess Benefits and (2) Recoupment*.[2]

In short, Westfield wants to pursue a "set up" strategy, so it can argue to the jury its version of "why" Plaintiffs brought this lawsuit. Yet Westfield seeks to preclude Plaintiffs from arguing that Westfield engaged in its own "set up" strategy, by delaying what should have been an obvious policy limits claim, in the hope that the claim handling would create

---

[2] *See also Soicher v. State Farm Mut. Auto. Ins. Co.*, 351 P.3d 559, 564, ¶ 19 (Colo.App. 2015) ("When an insurer asserts a noncooperation defense, the insured will likely be held to have forfeited his or her right to recover under an insurance policy when, in violation of a policy provision, the insured fails to cooperate with the insurer in some material and substantial respect and this failure to cooperate materially and substantially disadvantaged the insurer"). *Cf.* C.R.S. § 10-3-1118 (2020 statute with new and much stricter standard for supposed noncooperation by an insured).

some basis for a counterclaim, even if the basis is totally taken out of context. In Westfield's world, what is "good for the goose" is **not** "good for the gander." *See, e.g.*, Motion, at 4 ("Plaintiffs should be precluded from introducing evidence or making argument about Westfield' and its counsel's litigation conduct, ***including Westfield's decision to assert Counterclaims***, as proof of Westfield's bad faith.") (emphasis added).

To be clear, the assertion of the counterclaim here has nothing to do with litigation conduct *per se*, such as whether an attorney sent an incendiary letter or acted, arguably, in an overly aggressive manner. Rather, Plaintiffs' evidence here will be that the counterclaim theories are all based on mere mistakes or oversights, taken out of context. Plaintiffs will then argue (in closing) that the counterclaims are not meritorious. Clearly, Plaintiffs must be allowed to argue that the counterclaims lack merit.

Plaintiffs should also be allowed to argue the dramatic ***consequences*** of a finding for Westfield on any single allegation of misrepresentation. Indeed, the proposed instructions by Westfield set forth the dramatic consequences in detail. *See Excerpt of Westfield's proposed instructions (***Exhibit 7***)*, at 29-33 (electronic highlighting added).

This, then, leaves the issue of whether Plaintiffs (in closing) can argue that Westfield improperly "set up" the counterclaim, which is the converse of Westfield's argument that Plaintiffs "set up" the bad faith claim. Certainly, this would be relevant to the punitive damage claim. However, the ultimate resolution of this issue in an *Erie* / diversity case like this one is governed by the controlling Colorado case, *Parsons ex rel. Parsons v. Allstate Ins. Co.*, 165 P.3d 809 (Colo. App. 2006). While *Parsons* held that litigation conduct is generally not admissible as part of a bad faith claim, it also held that "evidence of ***an attorney's*** post-filing litigation conduct may be admitted if the risks of unfair prejudice, confusion of the issues, or misleading the jury … are substantially outweighed by the probative value of the evidence." *Id.* at 818 (emphasis added). Here,

the evidence will not relate to the actions of **an attorney**, but rather, to the actions of **a party**, *i.e.*, Westfield. Again, though, this highlights the need to deal with these competing arguments (effectively, two ships passing in the night) in the full context of trial.[3]

**4.      Plaintiffs are not seeking damages for their alternative "Norvell" design.**

Among the options Plaintiffs considered in rebuilding was the "Norvell" concept, which would have decreased the restaurant size, from a full-service restaurant to a coffee shop, and increased the number of residential units in the Building. Plaintiffs do not intend to seek damages for lost profits had they been able to construct this project.

Plaintiffs reserve the right to seek damages caused by the sale of the Building in its unrepaired condition pending this Court's ruling on Westfield's Motion to Strike and Plaintiffs' Motion for Leave to Supplement.

**5.      Westfield's Incentive Program**

Plaintiffs do not intend to offer evidence or testimony regarding Westfield's incentive program, unless Westfield otherwise "opens the door."

**6.      Westfield's Wealth**

Plaintiffs do not intend to introduce evidence regarding Westfield's wealth.

**7.      "Golden Rule" or similar arguments in closing**

Plaintiffs do not intend to make any "Golden Rule" or similar arguments that are "improper because [it] encourages the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence," *Blevins v. Cessna Aircraft Co.*, 728 F.2d 1576, 1580 (10th Cir. 1984) (citation omitted). Defendants have agreed to the same principle.

---

[3]      Based on the Motion, it is not even clear what Westfield means by "litigation conduct," which is another reason to defer ruling on this issue until trial.

Respectfully submitted on June 4, 2025.

/s/ Michael N. Poli
Michael N. Poli
      mpoli@pmzlaw.com
Lawrence R. Moon
      lmoon@pmzlaw.com
Poli Moon & Zane, PLLC
2999 N. 44th St., Ste. 325
Phoenix, AZ 85018; P: (602) 857-8180

/s/ Patrick M. Sweet
Patrick M. Sweet
      psweet@burgsimpson.com
Burg Simpson Eldredge Hersh & Jardine, P.C.
40 Inverness Drive East
Englewood, CO 80112; P: (303) 792-5595

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on June 4, 2025, a true and correct copy of this document was filed with the Court and served on counsel for Defendant via CM/ECF:

/s/    *Brenda Westra*